IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DON FILIPPO SCICCHITANO and CATERINA ANNA SCICCHITANO,<br>　　　　Plaintiffs<br>　　v.<br>MT. CARMEL AREA SCHOOL DISTRICT, MARY JONES, RICHARD BEIERSCHMITT, CHERYL LATORRE, MARY ANN KRAKOWSKI, BART McCOLLUM and ELAINE BARTOL,<br>　　　　Defendants | No. 4:09cv638<br><br>(Judge Munley) |

## **MEMORANDUM**

Before the court for disposition is the plaintiffs' motion for post-trial relief pursuant to Rules 50, 59 and 60 of the Federal Rules of Civil Procedure. (Doc. 64). The motion has been briefed and is ripe for disposition.

## **BACKGROUND**

The plaintiffs filed their complaint in this case on April 7, 2009 claiming a violation of their First Amendment rights, their rights to privacy, and their Equal Protection rights under the Fourteenth Amendment for their suspension and expulsion from school. (Compl. (Doc. 1)). No motion to dismiss or motion for summary judgment was filed.

Beginning on February 8, 2011, the court conducted a three-day trial, the Honorable Yvette Kane, Chief Judge for the United States District Court for the Middle District of Pennsylvania, presiding. Initially, the plaintiffs raised four legal claims under 42 U.S.C. § 1983: (1) a First Amendment retaliation claim; (2) a Fourteenth Amendment Equal Protection claim; (3) a Fourteenth Amendment Substantive Due Process claim; and (4) a claim for Monell liability against Defendant Mount Carmel Area School District. (Trial Briefs (Docs. 48, 49); N.T., 2/8/11, p. 16, 33-34

(Doc. 67)). The plaintiffs abandoned their Substantive Due Process claim during trial. (N.T., 2/9/11, p. 339 (Doc. 68)). The underlying factual question at trial was whether the defendants disciplined the plaintiffs for the plaintiffs' violation of a dress code or whether the discipline was in retaliation for the plaintiffs' protest of the code.

Plaintiffs Don Filippo Scicchitano ("Filipp") and Caterina Anna Scicchitano ("Catie") were students within Defendant Mount Carmel Area School District ("the District"). Defendant Richard Beierschmitt was the District's superintendent. (Defs.' Trial Brief (Doc. 49)). Defendant Cheryl Latorre was the District's assistant superintendent. (Id.) Defendant Mary John was the District's high school principal. (Id.) Defendant Mary Ann Krakowski was the District's elementary school principal. (Id.) Defendant Bart McCollum was Filipp's sixth grade teacher. (Id.) Defendant Elaine Bartol was a teacher's aide in the District. (Id.)[1]

Catie and Filipp were in fifth and sixth grade, respectively, in 2000 when the District instituted a new dress code. (N.T., 2/8/11 p. 61, 75, 117-19 (Doc. 67)). The dress code mandated particular clothing styles and colors. (N.T., 2/8/11 p. 61, 117-19). The code read, in part: "Boys: Khaki, dark Navy slacks, no cargo or baggy style; khaki, dark Navy shorts at an approved length, no cargo or baggy style; red, white, Navy blue, long- or short-sleeved golf shirt, with or without approved logo; shoes, sneakers, and coordinated socks." (N.T., 2/8/11, p.119). Girls could also wear skirts of an approved length. (N.T., 2/8/11, p. 117). The only logo approved was the school logo– a tornado. (N.T., 2/9/11, p.172). All students in the

---

[1] Defendant Mary Scicchitano, plaintiffs' aunt, worked for the Central Susquehanna Intermediate Unit and was assigned to work at the District. (Defs.' Trial Brief (Doc. 49)). She was dismissed by stipulation on January 24, 2011. (Doc. 44).

2

District were required to comply with the dress code and violations were punished progressively; students were given the option to change clothes and then faced detention, suspension, and finally expulsion for continued violations. (N.T., 2/8/11 p. 62, 207-08; N.T., 2/9/11 p. 230, 268-70 (Doc. 68)).

At the beginning of the 2000 school year, the plaintiffs decided to exercise their constitutional right to protest the dress code because they felt the dress code limited their ability to express their individuality. (N.T., 2/8/11 p. 64-66, 76). The plaintiffs also objected to the dress code because it prohibited some liturgical colors of religious importance to them. (N.T., 2/8/11 p. 105). The plaintiffs were granted a partial religious waiver of the code which allowed the plaintiffs to incorporate liturgical colors into their dress without punishment, so long as the clothing otherwise complied with the code. (N.T. 2/8/11, p. 124-25). The parties came to an agreement that permitted plaintiffs to wear logos protesting the dress code, so long as the clothing otherwise complied with the code. (N.T., 2/8/11, p. 135, 164-65, 172-73; N.T., 2/9/11, p. 262, 303, 306, 316).

Trial testimony showed a substantial disagreement between the parties as to what behavior constituted valid protest and what constituted mere nonconformity with the dress code. On many occasions, Filipp wore clothing with logos which the District interpreted as not protesting the dress code. (N.T., 2/8/11, p. 92 (shirt with word "logo"), p. 96 (shirt with picture of "Slinky dog," shirt with picture of "Squirtle" Pokemon character), 102, 140-43 (comedian Jeff Foxworthy T-shirt listing "top ten reasons you know you're a redneck"); N.T., 2/9/11, p. 237 ("Slinky dog" picture), 240 (leaning tower of Pisa), 243 (Secret Service emblem), 252-53 (State Department "Diplomat," "Nike"), 254-56 (Jeff Foxworthy T-shirt, Sylvester the cat, sheep with beer)). Often, the offending logo was on a nonconforming style of

3

clothing, such as a T-shirt. (N.T., 2/9/11, p. 243 (Secret Service emblem on nonconforming denim shirt), 254 (Jeff Foxworthy message on nonconforming white T-shirt)). Filipp also wore outfits with logos which the District admitted were clearly in protest of the dress code, but the outfits did not otherwise comply with the dress code based on the clothing style or color. (N.T., 2/8/11, p. 89-93, 95, 106, 172-173, 185, 197, 214; N.T., 2/9/11, p. 235-36 (protest logo on nonconforming striped shirt), 238-239 (protest logo on nonconforming cream colored shirt), 243-246 (protest logos on nonconforming white T-shirts), 254).[2]

      Subjectively, Filipp believed that any clothing deviating from the dress code necessarily constituted protest of the dress code. (N.T., 2/8/11, p. 89-90 (blue shirt with nonconforming stripes "was in protest of the policy, so thus it was not in compliance," "it would be a protest, as we were not allowed to have stripes")). Filipp explained how each nonconforming logo or form of dress constituted a protest of the dress code and why he chose the logos and styles. (N.T., 2/8/11, p. 77 (Filipp and Catie planned each logo and article of clothing), 78, 141 (explaining message intended by "Squirtle" Pokemon logo), 140 (explaining message intended by "Slinky dog"), 141-43 (explaining message intended by Jeff Foxworthy T-shirts), 92 (explaining message intended by Italy shirt), 93 (explaining message intended by "logo" logo)).[3]

---

[2] Logos which the District admitted were clearly in protest of the dress code will be referred to as "protest logos." Logos which the District interpreted as not protesting the dress code will be referred to as "disputed logos."

[3] For instance, Carmine Scicchitano, testified that Filipp had chosen the Jeff Foxworthy T-shirts as a form of protest based on the United States Court of Appeals for the Third Circuit's decision in Sypniewski v. Warren

4

Filipp was not disciplined when he wore protest logos on compliant clothing. (N.T., 2/8/11, p. 172, 197; N.T., 2/9/11 p. 249-50, 262, 298). However, on occasions where Filipp wore (1) logos the District did not consider to be protest logos, that is, disputed logos, (2) protest logos on nonconforming clothing styles or colors, or (3) liturgical colors on nonconforming clothing styles Filipp was progressively disciplined; he was sent to the student support room fifteen times for in-school suspension and ultimately expelled from school in two consecutive school years. (N.T., 2/8/11, p. 77, 190; N.T., 2/9/11, p. 233-34, 247-48).

Like Filipp, Catie wore logos that the District did not consider to be protest logos. (N.T., 2/8/11 63 (snowflakes), 70 (flowers), N.T., 2/9/11 p. 297 (Disney characters, flowers)). Catie also wore protest logos on nonconforming clothing. (N.T., 2/8/11, p. 62-65 (First and Fourteenth Amendment language on nonconforming pink turtleneck)). Catie was disciplined for dress code violations; she was sent to the student support room ten times for in-school suspension and she ultimately withdrew from

---

Hills Reg. Bd. of Ed., 307 F.3d 243. Although then-eleven-year-old Filipp is commended for having based his actions on decided cases, it bears noting that this case does not in fact support his case. In Sypniewski, three brothers sought a preliminary injunction against the school's anti-harassment policy and its dress code. The court ruled that the Jeff Foxworthy redneck shirts at issue could not be prohibited under the school's anti-harassment policy without violating the First Amendment. Interestingly, the only brother to have been disciplined for wearing the Foxworthy shirt was suspended under the dress code– the code prohibited clothing referring to alcohol and the shirt referred to the "Bud Bowl." Because this brother had graduated, he no longer had standing to seek injunctive relief. Accordingly the Third Circuit had no occasion to decide whether the school was within its rights to suspend the student for nonconformity with the dress code.

5

school voluntarily.  (N.T., 2/8/11, p. 66-67, 190).

On February 9, 2011, the plaintiffs rested their case and moved for a directed verdict.  (N.T., 2/9/11, p. 273).  In support of their motion, the plaintiffs argued that all of plaintiffs' conduct was protest speech.  (N.T., 2/9/11, p. 273).  Counsel for plaintiffs argued that nonconforming clothing must be considered protest speech along with protest logos and liturgical colors:

> [T]he fact that they wore clothing that was out of compliance with the dress code as part of their protests certainly should be considered part of the protest in the context of what these kids were doing.
> One day they come with a protest logo, the next day they come with a shirt out of compliance and a protest logo, and then the next day they come with just a shirt out of compliance. It's clear what they were doing. It was clear that they were being punished for what they were doing. They were aware of the consequences of their actions, and they were moving forward with their actions because it was protests.
> I think the reasonable inference, Your Honor, is that all of their conduct was protests, and because it did not disrupt the educational process, I think it's protected, all of it is protected under the First Amendment.

(N.T., 2/9/11, p. 277-78).

The defendants also moved for judgment as a matter of law at the close of the plaintiffs' case.  (N.T., 2/9/11, p. 278).  The court ruled that Defendants Cheryl Latore, Mary Ann Krakowski, Bart McCollum, and Elaine Bartol were entitled to qualified immunity after "finding that there was not a clearly established constitutional right at the time of the actions in question." (N.T., 2/9/11, p. 338).  The plaintiffs objected to this ruling on qualified immunity.  (N.T., 2/9/11, p. 339).

On February 9, 2011, the court also decided that "the jury will be instructed, at plaintiffs' request, that there is a First Amendment protected speech right for the wearing of logos protesting the school uniform, and the wearing of liturgical colors, and that the Court will decide, as a matter of

law, should the jury find a retaliation based on non-conforming clothing as a form of protest, whether or not that activity is entitled to any First Amendment protection." (N.T., 2/9/11, p. 339). Plaintiffs and Defendants had no objections to this proposed instruction or the verdict sheet. (N.T., 2/9/11, p. 339). Testimony concluded on February 9, 2011.

On February 10, 2011, at sidebar before instructing the jury, the court ruled as a matter of law that plaintiffs' wearing of nonconforming clothing was not a protected activity. (N.T., 2/10/11, p. 358, 363). The court then instructed the jury as follows:

> The second element of plaintiffs' [Section 1983 claim] is that defendants deprived them of their federal constitutional rights. In this case, there are two constitutional rights involved: the First Amendment right to free speech and the Fourteenth Amendment right to equal protection. I will discuss these separately.
> First, the First Amendment claim. The First Amendment to the United States Constitution gives persons a right to free speech, association, and the right to petition the government for redress of their grievances. Here, Plaintiffs Don Filippo and Caterina Anna Scicchitano claim that they engaged in constitutionally protected speech by wearing certain clothing to school that was in violation of the school district's dress code which Plaintiffs claim was a substantial or motivating factor in defendants' actions in disciplining them.
> What speech or expression is protected under the First Amendment is a question of law for this Court to answer. I am instructing you that the following activities by plaintiffs constituted protected speech or expression under the First Amendment: Wearing logos protesting the school uniform policy and wearing liturgical colors.

(N.T., 2/10/11, p. 397-98). The plaintiffs had no objections to the jury instructions. (N.T., 2/10/11, p. 372-73, 408 (Doc. 69)). The plaintiffs also had no objections to the verdict sheets. (N.T., 2/10/11, p. 373).

On February 10, 2011 the jury returned a verdict in favor of the defendants against both plaintiffs. (Don Filippo Scicchitano Verdict Sheet

7

(Doc. 60), Caterina Anna Scicchitano Verdict Sheet (Doc. 62)).  The verdict sheets for both plaintiffs asked the jury:

> Do you find that [Plaintiff] was disciplined by the Mount Carmel Area School District for protesting the dress code by:
> Wearing clothing with logos?        YES___   NO___
> Wearing liturgical colors?          YES___   NO___
> Wearing nonconforming clothing?     YES___   NO___

(Special Interrog. #1, Don Filippo Scicchitano Verdict Sheet (Doc. 60); Special Interrog. #1, Caterina Anna Scicchitano Verdict Sheet (Doc. 62)). The jury found that both plaintiffs were not disciplined for wearing clothing with logos or for wearing liturgical colors.  (Id.)  The jury found that both plaintiffs were disciplined for wearing nonconforming clothing.  (Id.)

The verdict sheets for both plaintiffs then asked the jury:

> Did [Plaintiff] prove, by a preponderance of the evidence, that his protected speech was a substantial or motivating factor in the alleged retaliatory action by Defendants?
> YES___   NO___

(Special Interrog. #2 Don Filippo Scicchitano Verdict Sheet (Doc. 60); Special Interrog. #2, Caterina Anna Scicchitano Verdict Sheet (Doc. 62)). The jury found that the plaintiffs had not satisfied their burden of proof on this element.  (Id.)

The verdict sheets for both plaintiffs also asked the jury:

> Did [Plaintiff] prove, by a preponderance of the evidence, that Defendants intentionally treated him differently from other students who were similarly situated?
> YES___   NO___

(Special Interrog. #3 Don Filippo Scicchitano Verdict Sheet (Doc. 60); Special Interrog. #3, Caterina Anna Scicchitano Verdict Sheet (Doc. 62)). The jury found that the plaintiffs had not satisfied their burden of proof on this element.  (Id.)  Accordingly, judgment was entered in favor of the defendants and against the plaintiffs.  (J. (Doc. 63).

On March 9, 2011, the plaintiffs filed their post-trial motion. (Doc. 64). On March 29, 2011 this case was re-assigned to the undersigned judge, bringing the case to its present posture. (Doc. 66).

**JURISDICTION**

The court has federal question jurisdiction over this civil rights action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. §§ 1343(a)(3), (4) (granting district courts jurisdiction over civil actions brought to redress deprivations of constitutional or statutory rights by way of damages or equitable relief).

**LEGAL STANDARD**

The plaintiffs move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Rule 50 provides that after a party has been heard on an issue at a jury trial the court may order judgment as a matter of law if it finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. FED. R. CIV. P. 50(a). Rule 50(b) involves renewing the motion after trial:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

FED. R. CIV. P. 50(b).

The Third Circuit Court of Appeals has set forth the standard of

9

review we must follow in a motion for judgment as a matter of law as follows: "The legal foundation for the factfinder's verdict is reviewed *de novo* while factual findings are reviewed to determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." Intermilo, Inc. v. I.P. Enterprises, Inc., 19 F.3d 890, 892 (3d Cir. 1994) (internal quotations marks omitted). "A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." Raiczyk v. Ocean County Veterinary Hosp., 377 F.3d 266, 268 (3d Cir. 2004) (quotations and citations omitted).[4]

**DISCUSSION**

The plaintiffs raise three basic arguments. First, they "renew their motion under Rule 50 for a directed verdict on the grounds that the evidence clearly shows that on several occasions, the plaintiffs were disciplined exclusively for wearing logos already held to be protected speech as a matter of law by the Third Circuit." (Post-Trial Mot. ¶ 2 (Doc. 64)). Second, they argue that "the Court erred as a matter of law in granting qualified immunity to certain of the defendants and not permitting the case to proceed to the jury as against them." (Id. ¶ 3). Finally, the plaintiffs argue that "the evidence was otherwise clearly sufficient to support a verdict in favor of plaintiffs under appropriate verdict questions." (Id. ¶4). We will address each argument in turn.

---

[4] Besides their renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, the plaintiffs also move for a new trial under Rule 59 and for relief from judgment under Rule 60. The merits of the plaintiffs' arguments will be addressed with respect to their motion under Rule 50(b), and that analysis will underlie our ruling with respect to their motions under Rules 59 and 60.

**1. Whether Court Erred in Ruling that Merely Nonconforming Clothing Was Not First Amendment Speech**

"The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 283 (1977)).  A First Amendment retaliation claim under 42 U.S.C. § 1983 requires that plaintiffs "show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)).

The First Amendment protects not only free speech, but also communicative conduct.  "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Texas v. Johnson, 491 U.S. 397, 404 (U.S. 1989) (quoting Spence v. Washington, 418 U.S. 405 at 410-11 (1974)).  However, "a narrow, succinctly articulable message is not a condition of constitutional protection." Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 569 (1995).

Although "federal courts generally exercise restraint when considering issues within the purview of public school officials. . . [t]he

authority of public school officials is not boundless[.] The First Amendment unquestionably protects the free speech rights of students in public school." J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., – F.3d –, No. 08-4138, 2011 WL 2305973 at *7 (3d Cir. June 13, 2011) (citing Board of Educ., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853, 864 (1982); Morse v. Frederick, 551 U.S. 393, 396 (2007)).

> The [Supreme Court in Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503 (1969)] held that 'to justify prohibition of a particular expression of opinion,' school officials must demonstrate that 'the forbidden conduct would *materially and substantially interfere* with the requirements of appropriate discipline in the operation of the school.' Tinker, 393 U.S. at 509 (emphasis added) (quotation marks omitted). This burden cannot be met if school officials are driven by 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.' Id. Moreover, 'Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.' Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001).

J.S., 2011 WL 2305973 at *7.

The contours of free speech rights in the school context are further explained by the United States Court of Appeals for the Third Circuit in Saxe:

> Under [Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (U.S. 1986)], a school may categorically prohibit lewd, vulgar or profane language. Under [Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 286 (U.S. 1988)], a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. Speech falling outside of these categories is subject to Tinker's general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others.

Saxe, 240 F.3d at 214.

The plaintiffs argue that the court erred by ruling that the District could not, as a matter of law, have violated plaintiffs' First Amendment

rights for disciplining plaintiffs for noncompliance with the dress code given the totality of plaintiffs' protest.  Plaintiffs argue that such nonconforming clothing was, in fact, expressive conduct in protest of the dress code, and that the special interrogatory– asking the jury to specify what conduct led to discipline– was artificial.  The plaintiffs argue that, rather than parsing each type of activity, the court should have only asked whether the plaintiffs' speech caused a disruption justifying discipline.  Finally, plaintiffs argue that there was no evidence of disruption or obscenity.

      The defendants respond that the special interrogatory was not error.  The defendants argue that the plaintiffs did not establish that they were disciplined for protesting the dress code.  Rather, the plaintiffs were largely disciplined merely for wearing clothes that were not in compliance with the dress code and which gave no outward message of protest.  Further, defendants argue that the plaintiffs would have received the same discipline absent the alleged protected activity– the plaintiffs received progressive discipline for nonconforming clothing like other code violators.

      The defendants liken this case to Blau v. Fort Thomas Public School District, where the United States Court of Appeals for the Sixth Circuit addressed whether or not a student's refusal to comply with a school dress code constituted protected speech in and of itself.  401 F.3d 381 (6th Cir. 2005).  There, a twelve-year-old student and her father challenged a dress code on the basis that the student preferred clothes in which she felt good and which allowed her to express her individuality.  Id. at 386.  The student there did not violate the dress code or receive discipline.  The Sixth Circuit ruled that the school district did not violate the student's First Amendment rights because the plaintiffs could not show that the First Amendment protected the student's "generalized and vague desire to express her middle-school individuality."  Id. at 389.  The court ruled that the plaintiffs

13

had not established "that the desired conduct (e.g., the desired clothing) can fairly be described as imbued with elements of communication, which conveys a particularized message that will be understood by those who view [it.]" Id. at 390 (internal quotations ommitted) (citing Johson, 491 U.S. at 406; Spence, 418 U.S. at 411).  The court noted that the Supreme Court, in Tinker, "expressly contrasted the right to wear a black arm band, a 'direct, primary First Amendment right[] akin to 'pure speech,'' with the permissible 'regulation of the length of skirts or the type of clothing, to hair style, or deportment.'" Blau, 401 F.3d at 389 (quoting Tinker, 393 U.S. at 507-08).

We begin our analysis by noting that there was a legally sufficient factual basis for the jury to find that the plaintiffs were never disciplined for wearing logos on otherwise compliant clothing or for wearing liturgical colors on otherwise compliant clothing, as described in the background section, above.  There was also a legally sufficient factual basis for the jury to find that the plaintiffs were disciplined for wearing nonconforming clothing.  Specifically, the trial testimony established that the plaintiffs received discipline for three distinct clothing scenarios: (1) nonconforming clothing styles or colors with no logos and no liturgical colors; (2) nonconforming clothing styles or colors with disputed logos; and (3) nonconforming clothing styles or colors with protest logos.

These premises leave the court with a purely legal question.  To wit, whether it was error for the court to rule as a matter of law that the District could discipline plaintiffs for nonconforming clothing– regardless of whether that nonconforming clothing incorporated protest logos or liturgical colors– because such clothing was not protected activity under the First Amendment.  The plaintiffs have presented no case that can reasonably be read to hold that wearing nonconforming clothing is protected activity.  The

plaintiffs argue that <u>Saxe</u> supports their position. <u>Saxe</u> says that a school can automatically prohibit profane or obscene speech and regulate "school-sponsored speech," but otherwise can only regulate speech if it is disruptive, under <u>Tinker</u>. Those propositions are not at issue, however, because they presuppose speech, and the court cannot do so here. Instead we must ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." <u>Johnson</u>, 491 U.S. at 404.

     At trial the court determined that the plaintiffs' nonconforming clothing was insufficiently communicative to those viewing it, despite the plaintiffs' intent. Plaintiffs argue, however, that plaintiffs' nonconformity with the dress code in this case was necessarily in protest of the code and necessarily expressive conduct amounting to a protected activity. The logical conclusion of that argument is that the dress code itself is unconstitutional. Essentially, under plaintiffs' theory, no student need ever comply with a dress code so long as the student adds protest logos on enough occasions that it is clear to others that he or she is protesting the dress code. That argument is inconsistent, however, with plaintiffs' counsel's admission at trial that schools are entitled to adopt and enforce dress codes. (N.T., 2/9/11, p. 275 ("I think that schools can, as clearly state law provides, that a school can have a dress code. Clearly they can enforce a dress code.")). The court resolved the plaintiffs' logical inconsistency simply enough– by ruling that mere nonconformity with a dress code is not expressive conduct. The court does not now consider that ruling to be error.

     Having made that determination, it was also not error for the court to "parse" out the plaintiffs' various forms of conduct in the verdict sheets.

The court properly asked the jury to find facts; specifically, what conduct led to discipline. The plaintiffs would prefer that the jury have been asked simply whether the plaintiffs were disciplined for engaging in a totality of conduct consisting of the following: wearing nonconforming clothing, wearing protest logos and wearing liturgical colors. Such an interrogatory would beg the question and conflate the role of the court and jury. What conduct constitutes speech is a question of law. Essentially, the plaintiffs would entitle the jury to make a finding that nonconforming clothing is expressive conduct so long as it is accompanied– either in that outfit or on other days– with admitted protest logos. That determination is plainly not one for the jury, under First Amendment law, and had already been made by the court– in the negative. Therefore it was not error for the court to ask the jury to identify what conduct led to discipline. Accordingly, the plaintiffs motion will be denied on this issue.

## 2. Wether Court Erred in Granting Qualified Immunity

The court granted qualified immunity to Defendants Cheryl Latore, Mary Ann Krakowski, Bart McCollum, and Elaine Bartol. Qualified immunity protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005) (quoting Elder v. Holloway, 510 U.S. 510, 514 (1994)). The doctrine does not apply when state officials "violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. at 599-600 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)). Therefore, the court must examine: (1) whether the officials violated a constitutional right, and (2) whether that right was clearly established at the time. Id.; Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

Plaintiffs argue, in a continuation of their First Amendment argument,

that the court erred in granting qualified immunity. The plaintiffs argue that the court's ruling on what activity constituted speech underlaid its grant of qualified immunity. Plaintiffs argue that the law, as stated in <u>Saxe</u>, is clear and not in flux. The defendants respond that the defendants had a good faith belief that the dress code, and their enforcement of it, was constitutional. The defendants note that the dress code was implemented upon advice of counsel. Finally, they argue that even if the plaintiffs' constitutional rights were violated, such rights were not clearly established at that time.

The defendants were entitled to qualified immunity because, at the relevant time, there was no clearly established constitutional right to wear nonconforming clothing in protest of a dress code– even if that nonconforming clothing was accompanied some days with a protest logo. On this issue the court defers to its analysis, above, that the court did not err at trial in ruling that nonconforming clothing was not protected activity under the First Amendment. Accordingly, we determine that Defendants Cheryl Latore, Mary Ann Krakowski, Bart McCollum, and Elaine Bartol were entitled to qualified immunity and plaintiffs' motion will be denied.

**3. Whether Plaintiffs Were Entitled to a Directed Verdict**

The plaintiffs argue that they were disciplined because they protested the dress code, not because of nonconformity with the code. Plaintiffs state "[t]he evidence was clear and unequivocal throughout that the Plaintiffs were singled out, not because they were out of compliance with the dress code, but because they were protestors of the code. . . ." (Br. Supp. (Doc. 75 at 12)). The plaintiffs argue they presented "sufficient evidence" to establish their Equal Protection and First Amendment claims.

Regarding First Amendment claim, the plaintiffs were not entitled to directed verdict because there was conflicting testimony over what led to

17

plaintiffs' discipline. The plaintiffs' believed, and their counsel argued, that all of the discipline that the plaintiffs received was because of their protest. The defendants testified that they applied the dress code to all students and that on each occasion in which the plaintiffs received discipline, their clothing was not in conformance with the dress code. The jury ultimately found that plaintiffs were not disciplined for wearing protest logos and liturgical colors– the only protected speech the plaintiffs engaged in. That finding is fully supported by the evidence. Accordingly, the plaintiffs' motion will be denied with respect to whether plaintiffs were entitled to a directed verdict on their First Amendment claim.

With respect to plaintiffs' Equal Protection claim, the defendants argue that the plaintiffs did not show that the plaintiffs were arbitrarily treated differently from similarly situated students. Plaintiffs got the same progressive discipline everyone else got, only no one else progressed to expulsion.

Regarding the Equal Protection claim we determine that the plaintiffs were not entitled to a directed verdict. "To bring a successful claim under 42 U.S.C. § 1983 for denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990). Further, the plaintiff must show that he "'received different treatment from that received by other individuals similarly situated.'" Id. (quoting Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)). The defendants testified that they did not single plaintiffs out for enforcement and that the dress code was enforced against all students equally. (N.T., 2/9/11, p. 259, 269). The jury ultimately credited this testimony and found that the plaintiffs had not shown that they were treated differently from similarly situated students. That finding is fully supported by the evidence. Accordingly, the plaintiffs'

motion will be denied with respect to whether plaintiffs were entitled to a directed verdict on their Equal Protection claim.

**CONCLUSION**

For the reasons stated above, the plaintiffs' post-trial motion will be denied. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DON FILIPPO SCICCHITANO and CATERINA ANNA SCICCHITANO, Plaintiffs<br><br>v.<br><br>MT. CARMEL AREA SCHOOL DISTRICT, MARY JONES, RICHARD BEIERSCHMITT, CHERYL LATORRE, MARY ANN KRAKOWSKI, BART McCOLLUM and ELAINE BARTOL, Defendants | No. 4:09cv638<br><br>(JUDGE MUNLEY) |

## **ORDER**

**AND NOW**, to wit, this 27<u>th</u> day of September 2011, upon consideration of plaintiffs' motion for post-trial relief pursuant to Rules 50, 59 and 60 of the Federal Rules of Civil Procedure (Doc. 64), it is HEREBY **ORDERED** that the motion is **DENIED**.

BY THE COURT:

S/ James M. Munley

**JUDGE JAMES M. MUNLEY
United States District Court**